No. 24-7147, 24-7276, 24-7337

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

STATE OF ALASKA,
*Plaintiff/Appellee/Cross-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE,
*Defendant/Appellant/Cross-Appellee*,

and

CENTER FOR BIOLOGICAL DIVERSITY,
*Intervenor-Defendant/Appellant/Cross-Appellee.*

On Appeal from the United States District Court for the District of Alaska
No. 3:22-cv-00032 (Hon. Sharon L. Gleason)

_____

**CENTER FOR BIOLOGICAL DIVERSITY'S
FIRST BRIEF ON CROSS-APPEAL**

_____

Kristen Monsell
Emily Jeffers
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldivesity.org
ejeffers@biologicaldiversity.org

Marlee Goska
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*Attorneys for Intervenor-Defendant/Appellant/Cross-Appellee
Center for Biological Diversity*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26-1 of the Federal Rules of Appellate Procedure, the

Center for Biological Diversity certifies it has no parent companies, subsidiaries, or

affiliates that have issued shares to the public.


Date: February 26, 2025

/s/ *Kristen Monsell*
Kristen Monsell
Emily Jeffers
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldivesity.org
ejeffers@biologicaldiversity.org

Marlee Goska
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*Attorneys for Intervenor-*
*Defendant/Appellant/Cross-Appellee*
*Center for Biological Diversity*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES............................................................... iv

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION ..........................................................2

STATEMENT OF THE ISSUES ..............................................................3

ADDENDUM STATEMENT ..................................................................3

STATEMENT OF THE CASE.................................................................3

    I.     The ESA Requires Critical Habitat Designations for
            Listed Species................................................................3

    II.    The Bearded and Ringed Seal ESA-Listings .......................7

    III.   The Statutorily Mandated Critical Habitat Designations...................12

    IV.   Proceedings Below.........................................................16

STANDARD OF REVIEW ...................................................................18

SUMMARY OF ARGUMENT................................................................18

ARGUMENT ...................................................................................20

    I.     NMFS Complied With the ESA in Designating as Occupied
            Critical Habitat the Areas That Contain the Features Essential
            to the Conservation of the Bearded and Ringed Seal.........................20

            A.    The Standards for Designating Occupied and
                   Unoccupied Critical Habitat Are Distinct, and the
                   District Court Improperly Conflated These Separate
                   Statutory Standards ................................................21

B.    The Size of the Critical Habitat Area Designated by NMFS Is Lawful Under the ESA..........................................27

II.    The District Court's Determination That NMFS Must Consider Foreign Conservation Efforts in Designating Critical Habitat Is Contrary to the ESA's Plain Language.................32

III.    NMFS Properly Decided Not to Consider Excluding Additional Areas From the Critical Habitat Designations .................37

CONCLUSION .......................................................................42

STATEMENT OF RELATED CASES ....................................44

CERTIFICATE OF COMPLIANCE .....................................45

ADDENDUM ..................................................................... A1

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016)................................................................8, 11, 18

*Alaska Oil & Gas Ass'n v. Ross*,
722 Fed. App'x 666 (9th Cir. 2018)......................................................11

*Alaska Oil & Gas Ass'n v. Jewell*,
815 F.3d 544 (9th Cir. 2016)............................... 4, 6, 18, 28, 29, 32, 35

*Ariz. Cattle Growers' Ass'n v. Salazar*,
606 F.3d 1160 (9th Cir. 2009) ............................................. 19, 29, 35

*Bear Valley Mut. Water Co. v. Jewell*,
790 F.3d 977 (9th Cir. 2015) ................................................................24

*Cal. Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2020) ................................................................27

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) ................................................................5

*Cheneau v. Garland*,
997 F.3d 916 (9th Cir. 2021) ................................................................34

*Ctr. for Biological Diversity v. Norton*,
240 F. Supp. 2d 1090 (D. Ariz. 2003)................................................5

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006)................................................................6

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
67 F.4th 1027 (9th Cir. 2023) ........................................... 25, 26, 27, 36

*Defs. of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) ................................................................25

iv

*Espinosa v. United Student Aid Funds*,
    553 F.3d 1193 (9th Cir. 2008) ...............................................................27

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv*.,
    378 F.3d 1059, 1070 (9th Cir. 2004),
    *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004).....................6

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv*.,
    616 F.3d 983 (9th Cir. 2010) ........................................... 24, 27, 33, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*.,
    463 U.S. 29 (1983)...............................................................................18

*N. Spotted Owl v. Lujan*,
    758 F. Supp. 621 (W.D. Wash. 1991).................................................6

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)............................................................................25

*Rodriguez v. United States*,
    480 U.S. 522 (1987)............................................................................34

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014).............................................................18

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)..............................................................................3

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018)............................................................ 26, 38, 40, 41

**Statutes**

5 U.S.C. §§ 701–706...............................................................................2

5 U.S.C. § 706(2)(A)...............................................................................18

16 U.S.C. §§ 1401–02.............................................................................29

16 U.S.C. §§ 1531–1544 ................................................................ 2

16 U.S.C. § 1531(b) ................................................................. 4, 6

16 U.S.C. § 1532(17) ................................................................. 33

16 U.S.C. § 1532(3) ................................................................... 6

16 U.S.C. § 1532(5)(A) .......................................................... 21, 27

16 U.S.C. § 1532(5)(A)(i) ...................... 1, 4, 19, 21, 23, 24, 25, 35, 37

16 U.S.C. § 1532(5)(A)(ii) ...................................................... 22, 24

16 U.S.C. § 1532(5)(C) .............................................................. 28

16 U.S.C. § 1533(a)(1) ............................................................... 4

16 U.S.C. § 1533(a)(3) .......................................................... 20, 21

16 U.S.C. § 1533(a)(3)(A)(i) ..................................................... 6, 12

16 U.S.C. § 1533(b)(1)(A) ....................................................... 4, 33

16 U.S.C. § 1533(b)(2) ...................... 4, 12, 20, 29, 33, 38, 40, 41

16 U.S.C. § 1533(b)(6)(C) ........................................................... 6

16 U.S.C. § 1533(b)(6)(C)(ii) ....................................................... 6

28 U.S.C. § 1291 ..................................................................... 2

28 U.S.C. § 1331 ..................................................................... 2

**Regulations**

50 C.F.R. § 402.01(b) ................................................................ 4

50 C.F.R. § 424.02 ................................................................ 4, 21

50 C.F.R. § 424.12(a)(1)(i) ....................................................................6

50 C.F.R. § 424.12(b)(1)(ii) ..................................................................5

50 C.F.R. § 424.12(g) .............................................................................5

50 C.F.R. § 424.19(b) ...........................................................................39

## Federal Register Notices

81 Fed. Reg. 7414 (Feb. 11, 2016) ....................................................35

87 Fed. Reg. 43,433 (July 21, 2022) ...................................................5

## Legislative History

H.R. Rep. No. 94-887 (1976) ...............................................................5

# INTRODUCTION

This case involves critical habitat protections for the Beringia distinct population segment of the Pacific bearded seal ("bearded seal") and the Arctic subspecies of the ringed seal ("ringed seal"). Both species need ample sea ice to survive. It is the only surface where they breed, give birth, raise their young, and haul out to complete their annual molt. Ringed seals also need deep snow on top of sea ice to build snow caves that provide newborn and nursing pups with vital safeguards from the cold and from predators.

After finding the seals in danger of extinction within the foreseeable future because climate change will destroy the sea ice (and snow) the seals need to survive, the National Marine Fisheries Service (NMFS) listed both species as threatened under the Endangered Species Act (ESA) in 2012—decisions this Court upheld after being challenged by the State of Alaska and others. The listing of the seals triggered the agency's mandatory duty to designate critical habitat for both species based on the best available science. That is precisely what NMFS did. After an exhaustive review of the relevant science, NMFS designated the seals' occupied habitat areas that contain the "physical or biological features [] essential to the conservation of the[se] species" and that "may require special management considerations or protection." *See* 16 U.S.C. § 1532(5)(A)(i).

1

In overturning the designations, the district court misinterpreted the ESA and improperly read requirements into the statute that do not exist. Because NMFS's decision was the correct one under the ESA, this Court should reverse the district court and reinstate the critical habitat designations for bearded and ringed seals.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 (federal question) because Plaintiff's, the State of Alaska, claims arose under the ESA, 16 U.S.C. §§ 1531–1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. *See* 1-FedER-006.[1]

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment on September 26, 2024, resolving all claims. l-FedER-002.

All parties filed timely appeals. NMFS filed a notice of appeal on November 22, 2024. 4-FedER-460–61; Fed. R. App. P. 4(a)(l)(B). Alaska and Intervenor-Defendant Center for Biological Diversity filed notices of appeal on December 3 and December 5, 2024, respectively. 4-FedER-462–65; Fed. R. App. P. 4(a)(3).

---

[1] "FedER" refers to the Excerpts of Record that NMFS filed with its brief, ECF Nos. 22-1–22-5.

## STATEMENT OF THE ISSUES

1.  Whether, in designating occupied critical habitat for bearded and ringed seals, NMFS properly focused its analyses on how the designated areas contain the physical or biological features essential to the conservation of the seals;

2.  Whether the ESA requires NMFS to consider foreign conservation efforts when designating critical habitat for species whose ranges include areas outside the territory of the United States; and

3.  Whether NMFS reasonably decided not to consider excluding additional areas from the critical habitat designations.

## ADDENDUM STATEMENT

An addendum containing the pertinent regulatory authorities is appended to this brief. The addendum to NMFS's brief contains the relevant statutory authorities.

## STATEMENT OF THE CASE

## I.    The ESA Requires Critical Habitat Designations for Listed Species

The ESA represents "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA's purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be

conserved" and "to provide a program for the conservation of such … species." 16 U.S.C. § 1531(b).

To that end, Section 4 of the ESA requires the Secretary of Commerce, through NMFS, to list species it determines are endangered or threatened. *Id.* § 1533(a)(1).[2] NMFS must make such determinations "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A). The ESA also requires NMFS to timely designate critical habitat for listed species "on the basis of the best scientific data available" after considering the economic, national security, and other relevant impacts of the designation. *Id.* § 1533(b)(2); *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 551 (9th Cir. 2016) [hereinafter *Jewell*].

The ESA defines critical habitat, in pertinent part, as "specific areas within the geographical area occupied by the species … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection …." 16 U.S.C. § 1532(5)(A)(i); *see also* 50 C.F.R. § 424.02 (defining "physical or biological features" as "features that occur in specific areas and that are essential to

---

[2] NMFS and the U.S. Fish and Wildlife Service (FWS) share responsibility for administering the ESA. 50 C.F.R. § 402.01(b). In general, FWS has authority over terrestrial and freshwater species and NMFS has authority over marine species, including the bearded and ringed seal.

4

support the life-history needs of the species").[3] Regulations clarify that identifying

physical and biological features essential to the conservation of the species "may

include consideration of the … spatial and temporal arrangements of such

features." 50 C.F.R. § 424.12(b)(1)(ii). NMFS may only designate critical habitat

within U.S. jurisdiction. *Id.* § 424.12(g).

Legislative history shows that Congress saw critical habitat as perhaps the

most important element of the ESA:

> [C]lassifying a species as endangered or threatened is only the first step
> in insuring its survival. *Of equal or more importance is the
> determination of the habitat necessary for the species' continued
> existence.* Once a habitat is so designated, the Act requires that
> proposed Federal actions not adversely affect the habitat. If the
> protection of endangered and threatened species depends in large
> measure on the preservation of the species' habitat, then *the ultimate
> effectiveness of the Endangered Species Act will depend on the
> designation of critical habitats.*

*Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1098 (D. Ariz. 2003)

(quoting H.R. Rep. No. 94-887, at 3 (1976)).

Critical habitat designations for listed species are therefore "a central

component of the legal scheme developed by Congress to prevent the permanent

loss of species." *N. Spotted Owl v. Lujan*, 758 F. Supp. 621, 629 (W.D. Wash.

---

[3] NMFS and FWS amended the ESA regulations for designating critical habitat in
July 2022. *See* 87 Fed. Reg. 43,433 (July 21, 2022). All regulations cited refer to
those in effect in April 2022, when NMFS issued its critical habitat determinations.
*See California v. Norton*, 311 F.3d 1162, 1167 n.2 (9th Cir. 2002) (looking to the
regulations in place at the time of the agency's decision).

1991); *see also Jewell*, 815 F.3d at 550–51 ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers." (citing 16 U.S.C. §§ 1531(b), 1532(3)); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("[T]he purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery."), *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004).

The ESA generally requires NMFS to designate critical habitat concurrently with the listing of species. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C). If such habitat is "not then determinable," the ESA allows a delay in designation of "not more than one additional year." *Id.* § 1533(b)(6)(C)(ii). Further delays are not allowed. By the end of the additional year, NMFS "must publish a final [critical habitat rule], based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." *Id.* § 1533(b)(6)(C)(ii); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006) ("[C]ritical habitat designations are mandatory."). NMFS's ESA regulations specify the agency "may, but is not required to, determine that a designation would not be prudent" in limited circumstances, such as where "the species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat." 50 C.F.R. § 424.12(a)(1)(i).

Time has proven the wisdom of Congress's approach in mandating critical habitat designations. Studies have shown, for example, that species with critical habitat are more than twice as likely to be recovering, and less than half as likely to be declining, than species without it. CBD_SER-031–37.

## II.    The Bearded and Ringed Seal ESA-Listings

In May 2008, Intervenor-Defendant Center for Biological Diversity petitioned NMFS to list bearded and ringed seals under the ESA based on the threat of sea ice loss due to climate change. 4-FedER-397. NMFS listed both species as threatened in 2012. 4-FedER-396–425 (bearded seals), 4-FedER-426–59 (ringed seals).

In doing so, NMFS found the principal threat to the seals "is habitat alteration stemming from climate change." 4-FedER-398, 428. This is because, as NMFS explained, sea ice is the only surface where these seals breed, give birth, nurse pups, and haul out to complete their annual molt. 4-FedER-399–400, 430–31. It also gives bearded seal mothers close access to food while nursing and a safe place for pups to learn how to dive and hunt away from predators. 4-FedER-399–400. Yet sea ice is rapidly declining and projected to continue to do so for the foreseeable future. *See, e.g.*, 4-FedER-400–01, 419, 429.

Bearded seals primarily feed on benthic (i.e., seabed-dwelling) organisms that are more plentiful in shallow waters where light can reach the seafloor.

7

CBD_SER-012. As such, the bearded seal's range is generally restricted to areas where seasonal sea ice occurs over relatively shallow waters, typically less than 200 meters deep. *Id.*; *see also Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 677 (9th Cir. 2016) [hereinafter *Pritzker*] (noting the agency's conclusion that "the availability of sea ice in shallow water was crucial to the [bearded seal's] viability").

And unlike other seals, ringed seals excavate caves in the snow on top of sea ice, forming subnivean lairs, or snow caves. *See* 4-FedER-430. These snow caves hide seals from predators and provide insulation from the extreme cold while seals are resting, which is especially important in spring, when adult females are whelping and nursing their young. *Id.* Pups are much more likely to freeze to death or be eaten by predators without snow caves; indeed, studies have documented a nearly 100 percent pup mortality rate without them. *Id.* (citing studies).

"Snow drifts to 45 [centimeters] or more are needed for excavation and maintenance of simple lairs, and birth lairs require depths of 50 to 65 [centimeters] or more." 4-FedER-431 (citing studies). These drift levels normally only occur on flat ice "where average snow depths are at least 20–30 [centimeters] and where drifting has taken place along pressure ridges or ice hummocks." *Id.* (citing studies). Areas with "less than 20 [centimeters] average snow depth in April [are] inadequate for the formation of ringed seal birth lairs." *Id.* Sea ice is essential to

8

the formation of snow caves—the loss of sea ice as a platform to collect snow

substantially reduces the amount of snow that can accumulate. 4-FedER-442

(citing study).

In listing both species, NMFS relied on models widely accepted as the best

available science on climate change, using them to analyze impacts from habitat

loss through 2100. 4-FedER-398, 410–11, 428, 442–44. Specifically, NMFS used

observational and predictive data from the Intergovernmental Panel on Climate

Change (IPCC) to analyze the extent of Arctic sea ice loss (and snow cover loss in

the ringed seal listing) within the foreseeable future, then evaluated related effects

of such habitat loss. 4-FedER-398, 410–11, 428, 442–44. NMFS explained that,

because of the time lag between emissions and climactic changes, model

projections to 2050 are "primarily due to emissions that have already occurred and

those that will occur over the next decade." 4-FedER-410, 444. As such,

"conditions projected to mid-century are less sensitive to assumed future emissions

scenarios." 4-FedER-410, 444.

NMFS also explained that while "projections of [greenhouse gas emissions]

become increasingly uncertain and subject to assumed emissions scenarios in the

latter half of the 21st century, projections of air temperatures consistently indicate

that warming will continue throughout the century." 4-FedER-410, 444. And while

"the magnitude of the warming depends somewhat on the assumed emissions

scenario, the trend is clear and unidirectional," with "relatively little uncertainty that warming will continue." 4-FedER-410, 444. This warming means "loss of sea ice and reduced snow cover will continue throughout the 21st century." 4-FedER-410, 444. As NMFS explained in its ringed seal listing decision, ten additional climate models also predicted substantial decline in snow cover through 2100, confirming the IPCC's projections. 4-FedER-442.

Based on these models and other science, NMFS concluded that (1) "the consequences of habitat change associated with a warming climate can be expected to manifest throughout the current breeding and molting ranges" of bearded and ringed seals, and (2) "ongoing and projected changes in sea ice habitat pose significant threats to the persistence of" both species. 4-FedER-406, 438. NMFS also concluded that "[w]ithin this century, snow cover is forecasted to be inadequate for the formation and occupation of birth lairs over most of the [ringed seals'] range." 4-FedER-437; *see also* 4-FedER-429 (models show that by mid-century there will be inadequate snow cover in April for ringed seals to build and maintain snow caves in large portions of their range). NMFS then determined that such losses would likely cause the extirpation of bearded and ringed seals from most places they live and threaten the species with extinction within the foreseeable future. 4-FedER-405, 437. NMFS listed both seals as threatened as a result. 4-FedER-405, 437.

Alaska and others challenged both listing rules on a variety of grounds, claiming, *inter alia*, that NMFS's decisions were not based on the best available science, that the seals' populations were plentiful, and that the climate science was too uncertain to support the listings. *See Pritzker*, 840 F.3d at 674–75 (bearded seal); *Alaska Oil & Gas Ass'n v. Ross*, 722 Fed. App'x 666, 668 (9th Cir. 2018) [hereinafter *Ross*] (ringed seal). The Ninth Circuit rejected their arguments, declaring, "the IPCC climate models constitute[ ] 'the best available science' and reasonably support[ ] the determination that a species reliant on sea ice likely would become endangered in the foreseeable future." *Pritzker*, 840 F.3d at 679 (citation omitted); *Ross*, 722 Fed. App'x at 668–69 (quoting *Pritzker*).

The Ninth Circuit further held that courts cannot require the agency to "wait until it ha[s] quantitative data reflecting a species' decline … before it could adopt conservation policies to prevent that species' decline." *Pritzker*, 840 F.3d at 683; *Ross*, 722 Fed. App'x at 668 (quoting *Pritzker*). As such, "[u]ncertainty regarding the speed and magnitude of" sea ice or snow cover loss "does not invalidate data presented in the administrative record that reasonably supports the conclusion that loss of habitat at key life stages will likely jeopardize the [bearded and ringed seals'] survival over the next 85 years." *Pritzker*, 840 F.3d at 683; *Ross*, 722 Fed. App'x at 668 (quoting *Pritzker*).

11

### III.   The Statutorily Mandated Critical Habitat Designations

The ESA listings of bearded and ringed seals triggered NMFS's mandatory duty to designate critical habitat for both species based on the best available science. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(2). NMFS did not designate critical habitat at the time of these listings but instead invoked the one-year extension and solicited public comments to help inform the designations. *See* 4-FedER-397, 427.

Following litigation challenging NMFS's prolonged failure to designate critical habitat for either species, NMFS issued separate proposed critical habitat designations in January 2021. *See* 2-FedER-025, 076. NMFS held three public hearings and invited public comments on the proposed designations and the accompanying Draft Impact Analysis Reports (analyzing the costs and benefits of the proposed designations) until April 2021. 2-FedER-041, 095.

NMFS also submitted the proposed designations for peer reviews. 2-FedER-041, 095. "The peer reviewers generally agreed that [NMFS] relied on the best available data regarding the habitat requirements of [bearded and ringed seals] and generally concurred with [NMFS's] application of this information in determining specific areas that meet the definition of critical habitat." 2-FedER-041, 095.

NMFS finalized the designations in April 2022. In doing so, NMFS explained how it examined "the best scientific information available regarding the natural history of [bearded and ringed seals] and the habitat features that are

12

essential to support the species' life-history needs," identifying three "physical and biological features … essential to the [seals'] conservation … within U.S. waters occupied by the species." 2-FedER-029, 080. For bearded seals they are:

> *(1) Sea ice habitat suitable for whelping and nursing, which is defined as areas with waters 200 [meters] or less in depth containing pack ice of at least 25 percent concentration and providing bearded seals access to those waters from the ice.…*

> *(2) Sea ice habitat suitable as a platform for molting, which is defined as areas with waters 200 [meters] or less in depth containing pack ice of at least 15 percent concentration and providing bearded seals access to those waters from the ice.…*

> *(3) Primary prey resources to support bearded seals: Waters 200 [meters] or less in depth containing benthic organisms, including epifaunal and infaunal invertebrates, and demersal fishes.*

2-FedER-029, 030.

For ringed seals they are:

> *(1) Snow-covered sea ice habitat suitable for the formation and maintenance of subnivean birth lairs used for sheltering pups during whelping and nursing, which is defined as waters 3 [meters] or more in depth (relative to [mean lower low water]) containing areas of seasonal landfast (shorefast) ice or dense, stable pack ice, that have undergone deformation and contain snowdrifts of sufficient depth to form and maintain birth lairs (typically at least 54 [centimeters] deep).…*

> *(2) Sea ice habitat suitable as a platform for basking and molting, which is defined as areas containing sea ice of 15 percent or more concentration in waters 3 [meters] or more in depth (relative to [mean lower low water]).…*

> *(3) Primary prey resources to support Arctic ringed seals, which are defined to be small, often schooling, fishes, in particular Arctic cod,*

13

> *saffron cod, and rainbow smelt; and small crustaceans, in particular, shrimps and amphipods.*

2-FedER-080, 081, 082.

The specific boundaries of the critical habitat designations for each species differ, reflecting the differences in where the essential habitat features for each species are found. *See, e.g.*, 2-FedER-031–34 (describing how NMFS determined the boundaries for bearded seal critical habitat), 2-FedER-083–85 (describing how NMFS determined the boundaries for ringed seal critical habitat).

NMFS explained how "[t]he seasonality of ice cover strongly influences Arctic ringed seal movements, foraging, reproductive behavior, and vulnerability to predation," 2-FedER-077, and, likewise, "[b]earded seal movements and habitat use are strongly influenced by the seasonality of sea ice," with "many seals migrat[ing] seasonally to maintain access to [drifting sea] ice," 2-FedER-031. NMFS further explained that the designations were as specific as the best available science allows given the "dynamic" and "variable" nature of the sea ice essential features "on both spatial and temporal scales." 2-FedER-031, 083; *see also* 2-FedER-051 ("In making decisions about the appropriate scale and boundaries for the specific areas … [NMFS] considered, among other factors, the life history of the species and the scales at which data are available to inform [its] analysis.").

NMFS then identified the threats that imperil each essential critical habitat feature and how they may require special management considerations or

14

protections as a result. 2-FedER-034–36, 085–88. Specifically, for both critical habitat designations, NMFS identified those threats as climate change; oil and gas activities; marine shipping and transportation; and commercial fisheries. 2-FedER-034–36, 085–88. And NMFS then explained how each of these threats can reduce the quality or quantity of the sea ice essential feature and cause changes in the seals' prey distribution, abundance, or composition. 2-FedER-034–36, 085–88.

The agency also explained the economic costs of the designations and the numerous benefits of the designations to each species. For example, NMFS noted "the primary benefit" of the designations is that all federal agencies will now be required to consult with NMFS to ensure their actions do not adversely modify or destroy the protected habitat. 2-FedER-038, 089. The agency also described several other benefits, "including education and enhanced public awareness, which may help focus and contribute to conservation efforts for the [seals] and [their] habitat." 2-FedER-038, 089. The agency detailed these costs and benefits in its Final Impact Analysis Reports. *See, e.g.*, 2-FedER-047–48, 099–101.

NMFS designated "approximately 174 million acres of critical habitat for the bearded seal" and "164 million acres for the ringed seal." 1-FedER-006; *see also* 2-FedER-074–75 (bearded seal critical habitat boundaries and map), 2-FedER-130–31 (ringed seal critical habitat boundaries and map). For both critical habitat designations, NMFS included only "a subset" of areas occupied by the

15

species in the Bering, Beaufort, and Chukchi Seas in U.S. waters. 2-FedER-050–

51, 105. Both designations exclude large areas of the Beaufort Sea occupied by the

species, including nearly half of the ringed seal's northernmost habitat in the

Beaufort Sea. *See* 2-FedER-075, 131.

## IV.    Proceedings Below

Alaska filed a lawsuit challenging the ringed and bearded seal critical habitat

designations in February 2023. 1-FedER-006. As the district court summarized,

Alaska challenged NMFS's:

> (1) failure to designate specific areas as critical habitat; (2) failure to
> consider all of the species' global habitat; (3) failure to designate
> specific areas that contain the essential habitat features; (4) failure to
> explain how the essential habitat features will be protected by the
> designations; (5) failure to analyze whether each critical habitat
> designation is prudent; and (6) violation of ESA § 4(b)(2), which
> requires the agency to take into consideration the economic, national
> security, and other relevant impacts when designating critical habitat.

*Id*.

The district court vacated the designations and remanded to NMFS. First, the

district court held that "NMFS made these designations [] without explaining why

the entirety of each designated area is necessary to the seals' survival and recovery,

or why a smaller area would be inadequate for their conservation.…" 1-FedER-

008. Second, while recognizing that NMFS may only designate critical habitat

within U.S. jurisdiction, the court held that NMFS improperly failed to "consider

foreign nation efforts in determining what habitat in the United States would be

16

indispensable to the seals." 1-FedER-009. The district court also held that NMFS's failure to explain why the designated areas are essential to the seals' conservation meant that the agency abused its discretion in choosing not to consider excluding areas that Alaska and the North Slope Borough requested be excluded from the designations. 1-FedER-011–12.

The district court rejected Alaska's argument that NMFS must identify precisely where the seals' essential habitat features "are found within the larger occupied area." 1-FedER-010 (citation omitted). The court did so based on NMFS's explanation that sea ice is "dynamic and variable on both spatial and temporal scales." *Id*. (citation omitted). Therefore, Alaska was "demand[ing] greater scientific specificity than available data could provide." *Id.* (alteration in original) (citation omitted). The court likewise rejected Alaska's argument that NMFS must specify particular special management considerations or protections in making such designations, holding the ESA only requires NFMS to determine that essential habitat features "may" need such considerations in the future, and NMFS satisfied this "relatively minor legal hurdle." 1-FedER-010–11. Finally, the court held that the ESA contains no requirement for NMFS to make an express prudency determination when making a critical habitat determination. 1-FedER-011.

## STANDARD OF REVIEW

The Ninth Circuit "reviews de novo [a] district court's evaluations of an agency's action." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014) (citation omitted). The Administrative Procedure Act (APA) governs the standard and scope of judicial review of a critical habitat designation. *See Jewell*, 815 F.3d at 554. In reviewing an agency decision under the APA, courts must determine whether that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A) (additional citation omitted)); *see also Pritzker*, 840 F.3d at 675 (noting review under the APA is "deferential and narrow" (citation omitted)).

In applying this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Rather, the court examines whether the agency considered the relevant factors and "articulate[d] … a rational connection between the facts found and the choice made," and if "there was a clear error of judgment." *Id.* (cleaned up) (citations omitted). A court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citations omitted).

## SUMMARY OF ARGUMENT

NMFS's critical habitat designations for bearded and ringed seals are consistent with the plain terms of the ESA and its implementing regulations. In

holding otherwise, the district court imposed requirements upon the agency's designation of occupied critical habitat that are inconsistent with the ESA and Ninth Circuit caselaw.

First, in holding NMFS's critical habitat designations unlawful for not explaining "why the entirety of the designated areas … are indispensable to the seals' survival and recovery," 1-FedER-010, the district court conflated the statutory requirements for designating unoccupied habitat with that of occupied habitat. As this Court has recognized, the ESA "differentiates between 'occupied' and 'unoccupied' areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring [NMFS] to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2009). But such a showing is not required for the designation of occupied critical habitat. Instead, the ESA requires NMFS to designate the areas that it determines *contain the "physical or biological features* (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i) (emphasis added). That is precisely what NMFS did here.

Second, in holding NMFS's critical habitat designations unlawful for not considering conservation efforts in foreign nations, 1-FedER-009, the district court read requirements into the statute that do not exist. Nothing in the ESA requires

NMFS to consider such efforts in designating critical habitat. *See* 16 U.S.C.

§ 1533(a)(3), (b)(2). The district court's contrary ruling disregards fundamental

principles of statutory construction showing that if Congress had intended NMFS

to consider this factor, it would have said as much.

<u>Third</u>, in holding that NMFS abused its discretion in deciding not to exclude

additional areas from the critical habitat designations, the district court again

ignored the ESA's plain language. The district court tied its holding on this issue to

its improper conflation of the separate standards for designating occupied and

unoccupied critical habitat. 1-FedER-012. The district court also disregarded

record evidence demonstrating that NMFS conducted an extensive analysis of the

economic impacts of the critical habitat designations and exercised its discretion

not to exclude additional areas from the designation based on that analysis.

## ARGUMENT

### I.   NMFS Complied With the ESA in Designating as Occupied Critical Habitat the Areas That Contain the Features Essential to the Conservation of the Bearded and Ringed Seal

NMFS's critical habitat designations for bearded and ringed seals—which

include only occupied habitat—comply with the ESA. NMFS relied on the best

available science to identify the physical and biological features essential to the

conservation of these species and then designated the areas that contain these

features and may require special management, thoroughly explaining the reasons

for its decisions. *See* 16 U.S.C. §§ 1532(5)(A), 1533(a)(3). In holding the

designations unlawful, the district court imposed the separate statutory standard for

designating unoccupied habitat upon NMFS's designation of occupied habitat,

contrary to the ESA's plain language and longstanding caselaw.

The size of the critical habitat designations also influenced the district

court's decision. But, as NMFS explained in issuing the designations, the

designations reflect the best available science on the seals' habitat needs and the

dynamic nature of sea ice. 2-FedER-031, 083; *see also* 2-FedER-051. And the

plain language of the ESA provides no support for overturning the agency's well-

reasoned, well-supported decision due to the size of the designations.

## A. The Standards for Designating Occupied and Unoccupied Critical Habitat Are Distinct, and the District Court Improperly Conflated These Separate Statutory Standards

When NMFS is designating occupied critical habitat, the ESA requires the

area to contain "physical or biological features (I) essential to the conservation of

the species and (II) which may require special management considerations or

protection." 16 U.S.C. § 1532(5)(A)(i); *see also* 50 C.F.R. § 424.02 (defining

"physical or biological features" as "features that occur in specific areas and that

are essential to support the life-history needs of the species"). In contrast, when

designating unoccupied critical habitat, NMFS must determine that the areas

themselves "are essential for the conservation of the species." 16 U.S.C.

21

§ 1532(5)(A)(ii). Here, the district court and all parties recognized that NMFS only

designated occupied areas as critical habitat for the seals and that Alaska's

challenge was to this occupied critical habitat designation. 1-FedER-007.

The essential features NMFS identified for the bearded seal are (1) sea ice

suitable for whelping and nursing, (2) sea ice suitable for molting, and (3) primary

prey resources. 2-FedER-029–30. The essential features NMFS identified for the

ringed seal are (1) snow-covered sea ice suitable for the formation and

maintenance of subnivean birth lairs for sheltering pups during whelping and

nursing, (2) sea ice suitable for basking and molting, and (3) primary prey

resources. 2-FedER-080–82.

NMFS designated a subset of the seals' occupied sea ice habitat as critical

habitat and explained how the best available science shows that each of the

designated areas contain features essential to the seals' conservation. In issuing the

designation for ringed seals, NMFS explained that "[s]now-covered sea ice habitat

suitable for the formation and maintenance of subnivean birth lairs used for

sheltering pups during whelping and nursing is essential to conservation of the

Arctic ringed seal because without the protection of lairs, ringed seal pups are

more vulnerable to freezing and predation." 2-FedER-080. NMFS based this

explanation on scientific information demonstrating that, *inter alia*, "[w]hen snow

depth is insufficient, pups can freeze in their lairs," and "when lack of snow cover

22

has forced birthing to occur in the open, nearly 100 percent of pups died from predation." 2-FedER-101–02.

NMFS also explained why "[s]ea ice habitat suitable as a platform for basking and molting is essential to conservation of the Arctic ringed seal," namely "because molting is a biologically-important, energy-intensive process that could incur increased energetic costs if it were to occur in water, or increased risk of predation if it were to occur on land." 2-FedER-081. NMFS further explained it was "unaware of any studies establishing whether Arctic ringed seals can molt successfully in water, or reports of healthy Arctic ringed seals hauled out on land during the molt." *Id.*

Additionally, NMFS described how access to "[p]rimary prey resources are essential to conservation of the Arctic ringed seal because the seals likely rely on these prey resources the most to meet their annual energy budgets." 2-FedER-082. NMFS similarly explained why each of the identified features of bearded seal critical habitat are necessary for the species' conservation. 2-FedER-029–31.

The district court acknowledged NMFS's findings regarding these essential physical and biological features and concluded that "NMFS appropriately explained how it delineated an area containing the seals' essential habitat features," as required by 16 U.S.C. § 1532(5)(A)(i). 1-FedER-009. This finding, which was

based on the best available science, is all the ESA requires when NMFS is designating occupied critical habitat.

However, instead of stopping there, the district court then imposed an additional requirement on NMFS, declaring "the ESA requires that the *specific areas* designated be essential." 1-FedER-009 (emphasis added). In doing so, the district court conflated the ESA's standard for designations of occupied critical habitat with that for designations of unoccupied critical habitat. *Compare* 16 U.S.C. § 1532(5)(A)(i) (ESA requirement for designating *occupied* critical habitat, requiring *that physical or biological features* essential to the conservation of the species are found in the designated area), *with id.* § 1532(5)(A)(ii) (ESA requirement for designating *unoccupied* critical habitat, requiring a determination that *areas* themselves are essential for the conservation of the species).

This was legal error. As this Court has repeatedly recognized, "[e]ssential for conservation is the standard for unoccupied habitat, … and is a more demanding standard than that of occupied critical habitat." *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 990 (9th Cir. 2010) (citations omitted); *see also Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163 (similar); *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015) ("The ESA requires the [agency] to demonstrate that unoccupied area is 'essential' for conservation before designating it as critical habitat."); *cf. Defs. of Wildlife v.*

24

*Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (holding that FWS's interpretation of the ESA violated the rule of surplusage because it "conflate[d] distinct ESA protections for … 'threatened' and for 'endangered species'"); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 663 (2007) (holding that a lower court's reading of the ESA impermissibly "engraft[ed]" additional requirements onto the statute beyond the specified criteria in the provision at issue). In other words, the district court's directive is contrary to the plain text of the ESA, which only requires that areas designated as occupied critical habitat include "physical or biological features" that are "essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(i).

The district court primarily relied on *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 67 F.4th 1027 (9th Cir. 2023), to reach its conclusion. 1-FedER-007–09. But that case was about designating *unoccupied* critical habitat, and, in it, this Court recognized that "[t]he designation of unoccupied critical habitat is governed by a different and more stringent standard" than occupied critical habitat. *Ctr. for Biological Diversity*, 67 F.4th at 1047. This Court also explicitly recognized in that opinion that it is the presence of "physical or biological features" essential to a species' conservation that is required for designations of occupied critical habitat. *Id.* at 1045.

25

Moreover, the district court largely leaned on a quote from *Center for Biological Diversity* stating that "the Supreme Court construed the ESA's definition of 'critical habitat'—whether occupied or unoccupied—as including only 'areas that are *indispensable* to the conservation of the endangered species.'" *Id*. at 1037; *see* 1-FedER-008, 009. The Supreme Court's original quote, which addresses the lack of a standalone definition of the word "habitat" in the ESA, is:

> Under the statutory definition, critical habitat comprises areas occupied by the species "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," as well as unoccupied areas that the Secretary determines to be "essential for the conservation of the species." 16 U.S.C. §1532(5)(A). That is no baseline definition of habitat—it identifies only certain areas that are indispensable to the conservation of the endangered species.

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 20 (2018). When read in context, it becomes clear the Supreme Court was merely paraphrasing the statutory critical habitat definition and was not engrafting the requirement for designations of unoccupied critical habitat onto designations of occupied critical habitat.

Indeed, the Supreme Court in *Weyerhaeuser* had no occasion to even consider the requirements for designating critical habitat in *occupied* areas; the issue there was what "habitat" means in an *unoccupied* area. *Id*. at 16–17. As such, here, the district court "appears to have been misled by a stray remark" from an opinion where the Court "had no occasion" to consider the matter at issue.

26

*Espinosa v. United Student Aid Funds*, 553 F.3d 1193, 1199 n.3 (9th Cir. 2008). Accepting the district court's reading of this nonbinding dicta would create a conflict with the ESA's explicit language and caselaw that "addresses precisely th[e] issue" of what is required of NMFS when designating occupied critical habitat. *Id.*; *see also Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 662 (9th Cir. 2020) (noting that dicta does not control when a prior statement was "made casually and without analysis, uttered in passing without due consideration of the alternatives, [and] done as a prelude to another legal issue that command[ed] the panel's full attention." (citation omitted)).

Accordingly, the Supreme Court's statement in *Weyerhaeuser* has no bearing on the designation of occupied critical habitat here. The district court's reliance on this stray remark is misplaced and creates a conflict with the plain language of the ESA and interpreting caselaw. *See* 16 U.S.C. § 1532(5)(A); *Espinosa*, 553 F.3d at 1199 n.3; *Ctr. for Biological Diversity*, 67 F.4th at 1045, 1047; *Home Builders Ass'n of N. Cal.*, 616 F.3d at 989–90.

## B. The Size of the Critical Habitat Area Designated by NMFS Is Lawful Under the ESA

The district court also questioned the size of the area that NMFS designated as critical habitat for the seals and held that the ESA does not permit NMFS "to designate nearly all of the seals' occupied habitat within the United States as indispensable to the seals' conservation." 1-FedER-009. But there is no such

27

prohibition in the ESA, which only states that, "[e]xcept in those circumstances determined by [NMFS], critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species." 16 U.S.C. § 1532(5)(C).

Here, NMFS did not designate the seals' entire occupied habitat. Rather, it designated only "a subset of the habitat occupied and used" by the species in the Bering, Beaufort, and Chukchi Seas in U.S. waters. 2-FedER-051 (bearded seal), 2-FedER-105 (ringed seal). Both designations exclude large areas of the Beaufort Sea and the ringed seal's designation excluded nearly half of the ringed seal's northernmost habitat in the Beaufort Sea. *See* 2-FedER-075, 131.

NMFS's reasoning regarding the size of the seals' critical habitat designations is also consistent with this Court's decision upholding the 120 million-acre designation of occupied polar bear critical habitat. *See Jewell*, 815 F.3d at 552. There, the record "established that polar bears are highly mobile and spend most of their time on sea ice," and "it is difficult (if not impossible) to predict precisely where [polar bears] will move within denning habitat in the future." *Id*. at 559. For these reasons, this Court roundly rejected challenges to the size and scope of the polar bear's critical habitat designation, holding that the designation "cannot be legitimately characterized as 'excessive,'" *id.*, and that the

28

agency "drew rational conclusions from the best available scientific data, which is what the [ESA] requires," *id.* at 562.

The same is true here. NMFS based the areas it did designate on the best available science, as required by the ESA. *See* 16 U.S.C. § 1533(b)(2). And, as NMFS explained in detail in the final listing decisions and critical habitat designations, bearded and ringed seals are wide-ranging species. *See, e.g.*, 2-FedER-031 (describing wide range of bearded seal), 2-FedER-083 (describing wide range of ringed seal). While their ranges are large, all areas in the respective critical habitat designations are regularly used by the seals and contain the features essential to their survival. *See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164–67 (holding that habitat is "occupied" for critical habitat purposes if it is "regularly used by the species").

The Marine Mammal Commission[4] also emphasized these points in its support of the ringed seal critical habitat designation:

> Although the area being proposed by NMFS as critical habitat for ringed seals is large because of the occurrence of ringed seals throughout this area, the dependence of ringed seals on specific snow and sea ice conditions, the large inter-annual variation in the distribution of different snow and sea ice habitat types, and the large areas that individual ringed seals may use in a given year, the entire area proposed constitutes important habitat that is essential for the conservation of Arctic ringed seals—that is, protection of the entire area

---

[4] Congress established the Marine Mammal Commission to make recommendations to NMFS on matters related to marine mammals. 16 U.S.C. §§ 1401–02.

is necessary to prevent the ringed seals that occur in the United States from becoming endangered and to bring them to the point where the protections afforded by the [ESA] are no longer necessary.

CBD_SER-010; *see also* CBD_SER-005–06 (similar comments on proposed bearded seal critical habitat designation).

The primary reason for the bearded and ringed seals' wide-ranging habitat needs is because the sea-ice environment in which the seals spend their time and engage in their essential behaviors is extremely dynamic. The seals must move across vast expanses throughout the year to adjust to the constantly changing distribution of sea ice. Studies have demonstrated, for example, that individual ringed seals have traveled up to 6,140 kilometers (or 3,815 miles) during the open-water season. 2-FedER-079.

The Bering-Chukchi shelf comprises the largest area of continuous habitat for bearded seals. 2-FedER-027. "Bearded seals can reach the bottom everywhere along the shallow shelf, so it provides them favorable foraging habitat." *Id.* (citing study). "As the ice forms in the fall and winter, many bearded seals move south with the advancing ice edge through the Bering Strait into the Bering Sea where they spend the winter." *Id.* (citing study). During the winter and spring, pregnant females find broken pack ice over shallow areas on which to give birth, then hunt, nurse pups, and molt from this ice. *Id.* (citing studies). In the spring, as the ice begins to melt, many of the seals that wintered in the Bering Sea migrate north

through the Bering Strait and into the Chukchi and Beaufort Seas, following the sea-ice edge to spend the summer and early fall foraging in these waters. *Id.*

Ringed seals use nearly the entire ice field over the Bering Sea during winter and spring, when they are also found throughout the Chukchi and Beaufort Seas. 2-FedER-078. Ringed seals build snow caves, or subnivean lairs, on landfast ice and stable pack ice where snow depth is sufficient. 2-FedER-077–78 (citing studies). The snow is typically deep enough only where the ice has undergone a certain amount of deformation and where the snow has drifted into ice hummocks or pressure ridges. 2-FedER-078 (citing studies). During this time (the "subnivean period"), ringed seals rest, give birth, and nurse pups in these caves. 2-FedER-077–78 (citing studies). The number of ringed seals hauled out on the ice's surface usually increases during the spring as temperatures warm and the snow covering the seals' caves melts. 2-FedER-078. Ringed seals complete their annual molt on this ice during the spring (the "basking period"). *Id.* (citing studies). In spring, most ringed seals that winter in the Bering and southern Chukchi Seas migrate northward as the ice edge recedes, spending their summer "open-water period" in the pack ice of the northern Chukchi and Beaufort Seas. 2-FedER-079 (citing study). During this open-water period, ringed seals feed intensively to replenish their blubber supplies lost during from late winter to early summer. *Id.* (citing studies).

31

The Marine Mammal Commission noted the challenges of designating critical habitat given the dynamic nature of this habitat:

> Throughout their range, seals can move extensively and use different types of habitat for different functions at different times of the year. The sea ice habitat suitable for the formation and maintenance of subnivean lairs used to shelter mothers and pups during whelping and nursing as well as the sea ice habitat needed by ringed seals for molting and basking (two of the three primary constituent elements identified for Arctic ringed seal critical habitat in the proposed rule) is highly dynamic and varies considerably within and among seasons and between years. Thus one cannot identify a less extensive, specific geographic location for breeding or molting that will reliably support these functions year after year than has been identified in the proposed rule. A similar challenge exists for identifying specific areas of particular importance for foraging as seals feed throughout their range, year-round.

CBD_SER-009.

Against this backdrop, NMFS's critical habitat designations were appropriate, necessary, and lawful. *See Jewell*, 815 F.3d at 558–59, 561. The district court erred when it imposed additional limits on the size and area that NMFS may designate as occupied critical habitat.

## II. The District Court's Determination That NMFS Must Consider Foreign Conservation Efforts in Designating Critical Habitat Is Contrary to the ESA's Plain Language

The district court also erred in holding that NMFS "fail[ed] to consider an important aspect of the problem" by not "consider[ing] foreign nation conservation efforts" when designating bearded and ringed seal critical habitat. 1-FedER-010 (first alteration in original). The district court based this holding on its erroneous

32

belief that the ESA "requires" the agency "to consider foreign nation efforts when designating critical habitat …." 1-FedER-009. The ESA contains no such requirement. To the contrary, the district court's interpretation is at odds with the ESA's plain language and decades of implementation of the ESA by NMFS and FWS.

The ESA is clear: it states that when make *listing* "determinations [under] subsection (a)(1)," NMFS must "tak[e] into account those efforts, if any, being made by any State[5] or *foreign nation*, or any political subdivision of a State or *foreign nation*, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas." 16 U.S.C. § 1533(b)(1)(A) (emphasis added). In contrast, the provision regarding *critical habitat designations* does not contain this requirement—or otherwise mention foreign nations at all. *See id.* § 1533(b)(2). Rather, it simply specifies that, in designating critical habitat, NMFS must "tak[e] into consideration the economic impact, the impact on national security, and any other relevant impact …." *Id.*; *see also Home Builders Ass'n of N. Cal.*, 616 F.3d at 992 (noting that "the plain language of ESA directs the agency to consider only those impacts caused by the critical habitat designation itself.").

---

[5] The ESA defines a "State" as "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands." 16 U.S.C. § 1532(17).

It is a basic principle of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (cleaned up). "This presumption applies with even greater force here, where Congress used particular language in one provision and not in another provision of the same subsection of the same statute." *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021).

This Court has recognized as much in rejecting other interpretations that would raise the bar for critical habitat designations. For example, in repudiating an argument that FWS must first identify when conservation will be achieved before designating critical habitat, this Court recognized that "all that ESA § 3(5)(A) requires before the designation of occupied critical habitat is a determination of what physical or biological features are essential to the conservation of the species." *Home Builders Ass'n of N. Cal.*, 616 F.3d at 989. The Court pointed to the ESA's requirement that NMFS establish a timeline for recovery in developing a recovery plan, to conclude "that if Congress had intended such a requirement to apply to critical habitat designations, it would have said so." *Id.* at 989–90. Because Congress did not, the Court could not read such a requirement into the statute. *See id.*

34

The same is true here. The ESA's plain language shows that had Congress intended to require NMFS to consider foreign conservation efforts in designating critical habitat it would have said as much. But it did not. The district court improperly read this requirement into the statute where none exists. *See, e.g.*, *Jewell*, 815 F.3d at 555 (overturning district court where its ruling on FWS's critical habitat designation for the polar bear "held [the agency] to a standard of specificity that the ESA does not require").

And the divergent mandates for listing and critical habitat designations make practical sense. The determination of what areas contain the "physical or biological features [] essential to the conservation of the species," 16 U.S.C. § 1532(5)(A)(i), is a biological question based on the life-history needs of the species at issue—the answer does not change depending on what efforts may or may not be occurring in other nations. *See, e.g.*, 81 Fed. Reg. 7414, 7419 (Feb. 11, 2016) ("The determination of specific features essential to the conservation of a particular species will be based on the best scientific data available … for that species."); *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1167 (recognizing that identifying critical habitat is "a scientific determination").[6]

---

[6] NMFS and FWS have explained that, in situations where a species exists in both the United States and another country, and the other country has "multiple areas that have the features essential to the conservation of the species," but "there are no such areas" within the United States, they will not designate critical habitat. 81 Fed. Reg. at 7432.

This Court's decision in *Center for Biological Diversity* regarding FWS's critical habitat designation for the jaguar is not to the contrary. *Contra* 1-FedER-009–10, n.115, 116 (citing *Ctr. for Biological Diversity*, 67 F.4th at 1037, 1045). The decision nowhere holds that FWS (or NMFS) must consider foreign efforts when designating critical habitat within the United States.

Rather, despite involving a species whose range includes both the United States and Mexico, the Court recognized that "the designation of occupied critical habitat under the ESA turns on the identification of the areas that the species occupies and where the [essential features] exist within those areas." *Ctr. for Biological Diversity*, 67 F.4th at 1045 (citation omitted). And while the decision references the importance of efforts in Mexico to jaguar recovery, the district court read too much into this reference. *Center for Biological Diversity* pointed to recovery efforts in Mexico solely to emphasize how FWS failed to show that designating *unoccupied* critical habitat was "indispensable" to the jaguar's conservation, as opposed to "merely beneficial." *See id.* at 1038, 1045; *see also id.* at 1046 (noting that "the importance of" the designated unoccupied habitat to the jaguar was "uncertain").

Here, the bearded and ringed seal critical habitat designations involve only occupied habitat, and NMFS thoroughly explained why the designated areas

36

contain the "physical or biological features [] essential to the conservation of the"

seals. 16 U.S.C. § 1532(5)(A)(i); *see also supra* Argument Section I.A.

## III. NMFS Properly Decided Not to Consider Excluding Additional Areas From the Critical Habitat Designations

The district court's finding that NMFS abused its discretion in not

considering whether to exclude additional areas from the critical habitat

designations rests on a misinterpretation of the ESA's mandates and overlooks

record evidence showing that NMFS conducted the proper evaluation of economic

impacts. NMFS here ultimately decided to exercise its discretion not to evaluate

excluding from the designations those areas requested by Alaska and the North

Slope Borough, but it did so after an express consideration of the economic

impacts as required by the Supreme Court in *Weyerhaeuser* and per the plain

language of the statute. 2-FedER-065, 122. This Court should uphold NMFS's

approach.

Section 4(b)(2) of the ESA states:

[NMFS] shall designate critical habitat … after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. [NMFS] may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area … unless [it] determines … that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

37

16 U.S.C. § 1533(b)(2). The Supreme Court has clarified that Section 4(b)(2) imposes a "unified process" for weighing the impact of designating an area as critical habitat. *Weyerhaeuser*, 586 U.S. at 24. "The first sentence of Section 4(b)(2) imposes a 'categorical requirement' that [NMFS] 'tak[e] into consideration' economic and other impacts before such a designation." *Id.* (citation omitted). The second sentence allows NMFS to choose to "exclude an area from critical habitat if [the agency] determines that the benefits of exclusion outweigh the benefits of designation." *Id.*

Here, NMFS followed the required process. NMFS prepared exhaustive Impact Analysis Reports, pursuant to Section 4(b)(2), for both critical habitat designations to "identify and evaluate the economic, socioeconomic, and other costs and benefits associated with" the designations "and assist the [agency] in determining whether the benefits of excluding any particular area from the [critical habitat] designation … outweigh the benefits of inclusion." 3-FedER-141 (bearded seal), 4-FedER-272 (ringed seal). These Impact Analysis Reports detail the activities that may occur within the critical habitats, analyze the incremental economic impacts of the designations relative to the baseline, and evaluate the benefits of critical habitat designation. *See* 3-FedER-147 (describing approach), 4-FedER-278 (same).

Both Impact Analysis Reports contain over 100 pages of analysis that carefully evaluate the costs, both direct and indirect, and benefits of critical habitat designation. 3-FedER-133–262, 4-FedER-264–395. Those economic costs are relatively low and are estimated to accrue primarily from the administrative costs of evaluating the effects of oil and gas activities on the critical habitats in Section 7 consultations. 2-FedER-039, 090. Although NMFS did not assess the benefits of the designations quantitatively, its economic analyses included a qualitative assessment of the benefits, as permitted by regulation. *See* 50 C.F.R. § 424.19(b) ("Impacts may be qualitatively or quantitatively described."). These benefits include notice to government agencies and the public of the "features essential to the conservation of the species, and information about the types of activities that may reduce the conservation value of the habitat," and the stimulation of "voluntary conservation actions by the public, as well as research, education, and outreach activities." 2-FedER-047–48, 101. Beyond benefits to the seals, NMFS also found that beneficial changes to their habitat could have positive benefits for the region's human population. 2-FedER-048 (identifying subsistence hunters as potentially indirect beneficiaries), 2-FedER-101 (same).

The second sentence of Section 4(b)(2) describes an optional process by which NMFS may go beyond the mandatory consideration of economic, natural security, and other relevant impacts and weigh the benefits of excluding any

39

particular area against the benefits of designating it. *See* 16 U.S.C. § 1533(b)(2); *Weyerhaeuser*, 586 U.S. at 24–25. NMFS elected to go through this process to exclude from ringed seal critical habitat "about 41 percent of the habitat north of the Beaufort Sea shelf" after the Navy requested the area be excluded for national security reasons. 2-FedER-119; *see also* 2-FedER-119–20 (discussing the Navy's concerns with including that area in the designation, and the conservation value of the area to the species). The Air Force requested that NMFS consider small exclusions from the bearded seal critical habitat near several radar sites, but NMFS declined to exclude the requested areas because the "benefits of exclusion do not outweigh the benefits of designation." 2-FedER-039–40.

Alaska and the North Slope Borough requested extensive exclusions from both critical habitat designations. Alaska "requested that a distance of 20 miles around communities and the Beaufort Sea coast be excluded," in order to avoid "regulatory burdens" associated with the Section 7 consultation process. 2-FedER-065 (bearded seal), 2-FedER-122 (ringed seal). The North Slope Borough similarly requested to "exclude from designation 10-mile buffer zones around all North Slope villages and all lands conveyed to the North Slope Borough or Alaska Native corporations in order to prevent … economic impacts and possible delays" for any projects subject to Section 7 consultation. 2-FedER-065, 122.

In evaluating these requests, NMFS emphasized that critical habitat designations "include[] no regulatory restrictions on human activities" where there is no federal involvement. 2-FedER-065, 122. For those activities with a federal nexus triggering Section 7 consultation, NMFS found that those consultations would not result in any significant economic impacts, and it declined to "exercise[] the discretion delegated to [NMFS] … to conduct an exclusion analysis to further consider and weigh the benefits of designation and exclusion of buffers around the requested areas." 2-FedER-065, 122.

As the Supreme Court recognized in *Weyerhaeuser*, the plain language of the statute provides that the ultimate decision whether to exclude areas from critical habitat is discretionary. 586 U.S. at 24–25 (evaluating 16 U.S.C. § 1533(b)(2) and stating that NMFS "'*may* exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of' specifying such area." (emphasis added) (citation omitted)). Only if the agency elects to pursue an analysis to determine whether an area should be excluded from critical habitat must it weigh the impacts and relative benefits of a particular area. Here, the agency determined it would not pursue an exclusion analysis for the areas requested by Alaska and the North Slope Borough due to the low economic impacts of the designations. 2-FedER-065, 122.

In finding that NMFS did not properly consider excluding those areas highlighted by Alaska and the North Slope Borough, the district court overlooked NMFS's consideration of economic impacts, as required by the first sentence of Section 4(b)(2), *see e.g.* 2-FedER-039, 090, and ultimate decision not to go through the elective exclusion process prescribed by Section 4(b)(2)'s second sentence. 2-FedER-065, 122. Indeed, the district court based its holding on its mistaken belief that NMFS failed to explain why the designated areas are "essential to the[ ice seals'] conservation." 1-FedER-012. But that is the standard that applies to the designation of *unoccupied* critical habitat and is not the standard for designating *occupied* critical habitat that applies here. *See supra* Argument Section I.A. The explanation the district court demanded is not required by the ESA, and NMFS provided the explanation that is. *See id.* NMFS's decisions not to exclude the areas that Alaska and the North Slope Borough requested were made after considering the relevant factors and should be upheld by this Court.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court and uphold NMFS's critical habitat designations.

42

Respectfully submitted on February 26, 2025,

/s/ *Kristen Monsell*
Kristen Monsell
Emily Jeffers
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldivesity.org
ejeffers@biologicaldiversity.org

Marlee Goska
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*Attorneys for Intervenor-*
*Defendant/Appellant/Cross-Appellee*
*Center for Biological Diversity*

## STATEMENT OF RELATED CASES

This appeal (9th Cir. No. 24-7377) is related to 9th Cir. No. 24-7147 (*State of Alaska v. National Marine Fisheries Service*, et al.) and 9th Cir. No. 24-7276 (*State of Alaska v. National Marine Fisheries Service*, et al.). All three appeals arise from the same district court judgment. Undersigned counsel is unaware of any other related cases within the meaning of Ninth Circuit Rule 28-2.6.

Dated: February 26, 2025                    /s/ *Kristen Monsell*
                                            Kristen Monsell

                                            *Attorney for Intervenor-*
                                            *Defendant/Appellant/Cross-Appellee*
                                            *Center for Biological Diversity*

44

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with word limitation of Ninth Circuit Rule 32-1(a) because it contains 9722 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

Dated: February 26, 2025
                                          /s/ *Kristen Monsell*
                                          Kristen Monsell

                                          *Attorney for Intervenor-*
                                          *Defendant/Appellant/Cross-Appellee*
                                          *Center for Biological Diversity*

# ADDENDUM

## INDEX TO ADDENDUM

*Except for the following, all applicable statutes, etc., are contained in the brief or addendum of the National Marine Fisheries Service. The regulations included herein are the regulations in place at the time the agency issued its decision: April 2022.*

50 C.F.R. § 402.01……………………………………………………………. A2

50 C.F.R. § 424.02…………………………………………………………..A4

50 C.F.R. § 424.12…………………………………………………………..A6

50 C.F.R. § 424.19……………………………………………………….A10

# 50 C.F.R. § 402.01

*CODE OF FEDERAL REGULATIONS > Title 50 Wildlife and Fisheries > Chapter IV — Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations > Subchapter A — > Part 402 — Interagency Cooperation - Endangered Species Act of 1973, as Amended > Subpart A — General*

## § 402.01 Scope.

**(a)** This part interprets and implements sections 7(a)-(d) [16 U.S.C. 1536(a)-(d)] of the Endangered Species Act of 1973, as amended ("Act"). Section 7(a) grants authority to and imposes requirements upon Federal agencies regarding endangered or threatened species of fish, wildlife, or plants ("listed species") and habitat of such species that has been designated as critical ("critical habitat"). Section 7(a)(1) of the Act directs Federal agencies, in consultation with and with the assistance of the Secretary of the Interior or of Commerce, as appropriate, to utilize their authorities to further the purposes of the Act by carrying out conservation programs for listed species. Such affirmative conservation programs must comply with applicable permit requirements (50 CFR parts 17, 220, 222, and 227) for listed species and should be coordinated with the appropriate Secretary. Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat. Section 7(a)(3) of the Act authorizes a prospective permit or license applicant to request the issuing Federal agency to enter into early consultation with the Service on a proposed action to determine whether such action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Section 7(a)(4) of the Act requires Federal agencies to confer with the Secretary on any action that is likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat. Section 7(b) of the Act requires the Secretary, after the conclusion of early or formal consultation, to issue a written statement setting forth the Secretary's opinion detailing how the agency action affects listed species or critical habitat Biological assessments are required under section 7(c) of the Act if

A2

listed species or critical habitat may be present in the area affected by any major construction activity as defined in § 404.02. Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. Section 7(e)-(0)(1) of the Act provide procedures for granting exemptions from the requirements of section 7(a)(2). Regulations governing the submission of exemption applications are found at 50 CFR part 451, and regulations governing the exemption process are found at 50 CFR parts 450, 452, and 453.

**(b)** The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) share responsibilities for administering the Act. The Lists of Endangered and Threatened Wildlife and Plants are found in 50 CFR 17.11 and 17.12 and the designated critical habitats are found in 50 CFR 17.95 and 17.96 and 50 CFR part 226. Endangered or threatened species under the jurisdiction of the NMFS are located in 50 CFR 222.23(a) and 227.4. If the subject species is cited in 50 CFR 222.23(a) or 227.4, the Federal agency shall contact the NMFS. For all other listed species the Federal Agency shall contact the FWS.

A3

## 50 C.F.R. § 424.02

*CODE OF FEDERAL REGULATIONS > Title 50 Wildlife and Fisheries > Chapter IV —*
*Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National*
*Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce);*
*Endangered Species Committee Regulations > Subchapter A — > Part 424 — Listing Endangered and*
*Threatened Species and Designating Critical Habitat > Subpart A — General Provisions*

## § 424.02 Definitions.

The definitions contained in the Act and parts 17, 222, and 402 of this title apply to this part, unless specifically modified by one of the following definitions. Definitions contained in part 17 of this title apply only to species under the jurisdiction of the U.S. Fish and Wildlife Service. Definitions contained in part 222 of this title apply only to species under the jurisdiction of the National Marine Fisheries Service.

*Candidate*. Any species being considered by the Secretary for listing as an endangered or threatened species, but not yet the subject of a proposed rule.

*Conserve, conserving, and conservation*. To use and the use of all methods and procedures that are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary, i.e., the species is recovered in accordance with § 402.02 of this chapter. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

*Geographical area occupied by the species*. An area that may generally be delineated around species' occurrences, as determined by the Secretary (i.e., range). Such areas may include those areas used throughout all or part of the species' life cycle, even if not used on a regular basis (e.g., migratory corridors, seasonal habitats, and habitats used periodically, but not solely by vagrant individuals).

*Habitat*. For the purposes of designating critical habitat only, habitat is the

A4

abiotic and biotic setting that currently or periodically contains the resources and conditions necessary to support one or more life processes of a species.

*List or lists.* The Lists of Endangered and Threatened Wildlife and Plants found at 50 CFR 17.11(h) or 17.12(h).

*Physical or biological features essential to the conservation of the species.* The features that occur in specific areas and that are essential to support the lifehistory needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features. A feature may be a single habitat characteristic, or a more complex combination of habitat characteristics. Features may include habitat characteristics that support ephemeral or dynamic habitat conditions. Features may also be expressed in terms relating to principles of conservation biology, such as patch size, distribution distances, and connectivity.

*Public hearing.* An informal hearing to provide the public with the opportunity to give comments and to permit an exchange of information and opinion on a proposed rule.

*Special management considerations or protection.* Methods or procedures useful in protecting the physical or biological features essential to the conservation of listed species.

*Species.* Includes any species or subspecies of fish, wildlife, or plant, and any distinct population segment of any vertebrate species that interbreeds when mature. Excluded is any species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of the Act would present an overwhelming and overriding risk to man.

*Wildlife or fish and wildlife.* Any member of the animal kingdom, including without limitation, any vertebrate, mollusk, crustacean, arthropod, or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

A5

## 50 C.F.R. § 424.12

*CODE OF FEDERAL REGULATIONS  >  Title 50 Wildlife and Fisheries  >  Chapter IV — Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations  >  Subchapter A —  >  Part 424 — Listing Endangered and Threatened Species and Designating Critical Habitat  >  Subpart B — Revision of the Lists*

## § 424.12 Criteria for designating critical habitat.

**(a)** To the maximum extent prudent and determinable, we will propose and finalize critical habitat designations concurrent with issuing proposed and final listing rules, respectively. If designation of critical habitat is not prudent or if critical habitat is not determinable, the Secretary will state the reasons for not designating critical habitat in the publication of proposed and final rules listing a species. The Secretary will make a final designation of critical habitat on the basis of the best scientific data available, after taking into consideration the probable economic, national security, and other relevant impacts of making such a designation in accordance with § 424.19.

**(1)** The Secretary may, but is not required to, determine that a designation would not be prudent in the following circumstances:

**(i)** The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;

**(ii)** The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;

**(iii)** Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

**(iv)** No areas meet the definition of critical habitat; or

**(v)** The Secretary otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.

**(2)** Designation of critical habitat is not determinable when one or both of the following situations exist:

**(i)** Data sufficient to perform required analyses are lacking; or

**(ii)** The biological needs of the species are not sufficiently well known to identify any area that meets the definition of "critical habitat."

**(b)** Where designation of critical habitat is prudent and determinable, the Secretary will identify specific areas within the geographical area occupied by the species at the time of listing and any specific areas outside the geographical area occupied by the species to be considered for designation as critical habitat.

**(1)** The Secretary will identify, at a scale determined by the Secretary to be appropriate, specific areas within the geographical area occupied by the species for consideration as critical habitat. The Secretary will:

**(i)** Identify the geographical area occupied by the species at the time of listing.

**(ii)** Identify physical and biological features essential to the conservation of the species at an appropriate level of specificity using the best available scientific data. This analysis will vary between species and may include consideration of the appropriate quality, quantity, and spatial and temporal arrangements of such features in the context of the life history, status, and conservation needs of the species.

**(iii)** Determine the specific areas within the geographical area occupied by the species that contain the physical or biological features essential to the conservation of the species.

**(iv)** Determine which of these features may require special management considerations or protection.

**(2)** The Secretary will designate as critical habitat, at a scale determined by the Secretary to be appropriate, specific areas outside the geographical area occupied by the species only upon a determination that such areas are essential for the conservation of the species. When designating

A7

critical habitat, the Secretary will first evaluate areas occupied by the species. The Secretary will only consider unoccupied areas to be essential where a critical habitat designation limited to geographical areas occupied would be inadequate to ensure the conservation of the species. In addition, for an unoccupied area to be considered essential, the Secretary must determine that there is a reasonable certainty both that the area will contribute to the conservation of the species and that the area contains one or more of those physical or biological features essential to the conservation of the species.

**(c)** Each critical habitat area will be shown on a map, with more-detailed information discussed in the preamble of the rulemaking documents published in the Federal Register and made available from the lead field office of the Service responsible for such designation. Textual information may be included for purposes of clarifying or refining the location and boundaries of each area or to explain the exclusion of sites (e.g., paved roads, buildings) within the mapped area. Each area will be referenced to the State(s), county(ies), or other local government units within which all or part of the critical habitat is located. Unless otherwise indicated within the critical habitat descriptions, the names of the State(s) and county(ies) are provided for informational purposes only and do not constitute the boundaries of the area. Ephemeral reference points (e.g., trees, sand bars) shall not be used in any textual description used to clarify or refine the boundaries of critical habitat.

**(d)** When several habitats, each satisfying the requirements for designation as critical habitat, are located in proximity to one another, the Secretary may designate an inclusive area as critical habitat.

**(e)** The Secretary may designate critical habitat for those species listed as threatened or endangered but for which no critical habitat has been previously designated. For species listed prior to November 10, 1978, the designation of critical habitat is at the discretion of the Secretary.

**(f)** The Secretary may revise existing designations of critical habitat according to procedures in this section as new data become available.

**(g)** The Secretary will not designate critical habitat within foreign countries or in other areas outside of the jurisdiction of the United States.

**(h)** The Secretary will not designate as critical habitat land or other geographic areas owned or controlled by the Department of Defense, or designated for its

use, that are subject to a compliant or operational integrated natural resources management plan (INRMP) prepared under section 101 of the Sikes Act (16 U.S.C. 670a) if the Secretary determines in writing that such plan provides a conservation benefit to the species for which critical habitat is being designated. In determining whether such a benefit is provided, the Secretary will consider:

**(1)** The extent of the area and features present;

**(2)** The type and frequency of use of the area by the species;

**(3)** The relevant elements of the INRMP in terms of management objectives, activities covered, and best management practices, and the certainty that the relevant elements will be implemented; and

**(4)** The degree to which the relevant elements of the INRMP will protect the habitat from the types of effects that would be addressed through a destruction-or-adverse-modification analysis.

A9

# 50 C.F.R. § 424.19

*CODE OF FEDERAL REGULATIONS > Title 50 Wildlife and Fisheries > Chapter IV — Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations > Subchapter A — > Part 424 — Listing Endangered and Threatened Species and Designating Critical Habitat > Subpart B — Revision of the Lists*

§ 424.19 Impact analysis and exclusions from critical habitat.

**(a)** At the time of publication of a proposed rule to designate critical habitat, the Secretary will make available for public comment the draft economic analysis of the designation. The draft economic analysis will be summarized in the Federal Register notice of the proposed designation of critical habitat.

**(b)** Prior to finalizing the designation of critical habitat, the Secretary will consider the probable economic, national security, and other relevant impacts of the designation upon proposed or ongoing activities. The Secretary will consider impacts at a scale that the Secretary determines to be appropriate, and will compare the impacts with and without the designation. Impacts may be qualitatively or quantitatively described.

**(c)** The Secretary has discretion to exclude any particular area from the critical habitat upon a determination that the benefits of such exclusion outweigh the benefits of specifying the particular area as part of the critical habitat. In identifying those benefits, in addition to the mandatory consideration of impacts conducted pursuant to paragraph (b) of this section, the Secretary may assign the weight given to any benefits relevant to the designation of critical habitat. The Secretary, however, will not exclude any particular area if, based on the best scientific and commercial data available, the Secretary determines that the failure to designate that area as critical habitat will result in the extinction of the species concerned.

A10